UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14107-CIV-MARRA/MAYNARD

BRADLEY BATZ,

       Plaintiff,

vs.

CITY OF SEBRING,

       Defendant.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant's Dispositive Motion for Summary Judgment [DE 19]. The motion is fully briefed and ripe for review. The Court has carefully considered the entire Court file, and is otherwise fully advised in the premises.

## Introduction

Plaintiff Bradley Batz ("Batz") was appointed to the position of Fire Chief of Defendant City of Sebring ("City") on May 15, 2006. Batz alleges that he served with distinction and received laudatory annual performance evaluations for ten years, until he attempted to enforce fire safety rules at the Kenilworth Lodge ("Lodge" or "Kenilworth"), an important historic building owned by powerful interests with connections to City Hall. When he resisted and reported the efforts of City officials to allow hazardous conditions in the Lodge to go unremedied, in violation of the Florida Fire Safety Code, the City discharged him on December 6, 2016. Batz sues the

City for equitable relief and damages for retaliation pursuant to the Florida's Whistle-blower's Act, Fla. Stat. §§ 112.3187-112.31895 (Counts I-IV), as well as for violation of Batz's right to free speech pursuant to the First and Fourteenth Amendments to the United States Constitution (Count V).

The City moves for summary judgment in its favor asserting the undisputed facts, viewed in the light most favorable to Batz, establish that (1) Batz did not engage in any statutorily protected activity, and therefore he cannot state a *prima facie* case of retaliation; (2) even assuming Batz engaged in protected activity, the facts clearly establish that he was discharged for a legitimate, non-discriminatory reason; and (3) any alleged speech occurred in the scope of Batz's duties as Fire Chief for the City of Sebring, precluding a claim under the First Amendment.

**Undisputed Material Facts**[1]

1.    Batz began his employment with the City in March of 1990 as a Firefighter/EMT.  He was appointed to Chief of the Sebring Fire Department in 2006.

2.    Batz's duties as Fire Chief were

> [t]o administer all day-to-day operations with the fire department. Budgeting, personnel oversight, equipment, purchasing, requisitions, payroll.  Oversee the training, education, and prevention activities of the department.  (Batz Depo. 7).

---

[1]  Much of Batz's testimony regarding representations made to him are included here, as his testimony is not challenged with any evidence presented by the City.

3.      The Lodge is a hotel in the City of Sebring.  The main building of the Lodge is a

        100-year-old four story wood frame building.  (DE 32-1, Declaration of Bradley

        Batz ("Batz Decl.") ¶ 5).

4.      The Lodge is co-owned by City of Sebring Council member Mark Stewart

        ("Stewart"), Monir Rahal ("Rahal") and Robert Mueller ("Mueller").  (DE 21-3,

        Affidavit of Mark Stewart ("Stewart Aff.") ¶ 3).  Stewart is a 49% owner, with

        Rahal and Mueller owning the majority interest in the building.  *Id.*  The

        relationship between Stewart and the other owners is strained and as such,

        Mueller and Rahal control the day-to-day operations of the Lodge, with Stewart

        having no involvement in the building's day-to-day management.  *Id.*

5.      On May 10, 2016, a fire broke out at the Lodge.  Batz, Assistant Chief Robert

        Border ("Border"), and other City firefighters responded to the fire and

        extinguished it.  (Batz Depo. 51).

6.      After extinguishing the fire, Batz determined that the cause of the fire was

        two mattresses in a mechanical room which were pushed against an air

        conditioning window unit.  (Batz Depo. 53-54).  The mattresses caused the AC

        unit to overheat, and the AC unit caught fire, which spread to the mattresses.

        (Batz Depo. 54).

7.      The initial cause of the fire constituted a violation of Florida's Fire Safety

        Code, and Batz informed the Lodge's maintenance employee, Raphael Negron

        ("Negron"), that, according to the Fire Safety Code, the business was not

permitted to have storage in an electrical room. (Batz Depo. 54-55).

8.     On May 12, 2016, two days after the fire, Batz and Border returned to the

Lodge for a follow-up inspection. (Batz Depo. 57, 62).  As the City did not

employ a Fire Inspector at the time, Batz was handling the duty of performing

the required periodic inspections of buildings within the City. (Batz Depo. 63).

9.     In the follow-up inspection, Batz and Border noticed and documented several

other violations of the Fire Safety Code, including exposed wiring,

malfunctioning emergency lights, exit doors which failed to open, excessive

extension cords, issues with the sprinkler systems, problems with breaker

boxes, and improper building storage. (Batz Depo. 60-61).  Batz took

photographs and extensively documented the issues and code violations

throughout the building.

10.    After the follow-up inspection, Batz and Border met with representatives from

the Lodge, including part-owner Mueller, Negron, and a member of the Lodge's

maintenance/engineering crew to discuss the changes needed in order to bring

the building up to code. (Batz Depo. 63-64).  Batz suggested Mueller contact

third-party contractors to address the electrical and sprinkler issues and

informed Mueller that a re-inspection of the building would occur. (Batz Depo.

66-67).

11.    Batz testified that Meuller told him and Border that part-owner Stewart "knew

what was wrong and needed to fix this stuff and never did do it." (Batz Depo.

65:19-24).  In addition, Meuller told Batz that Stewart is "not going to pay for it," and then Meuller "stood up, went nose-to-nose with [Batz], and told me that I might as well shut him down right now, because he isn't doing . . . a damn thing."  (Batz Depo. 65-66).  Batz then contacted Stewart, who said he didn't have anything to do with the building.  (Batz Depo. 69-70)

12.  On May 23, 2016, Batz and Border returned to the Lodge for another inspection of the building and met with Mueller regarding the status of sprinkler repairs. (Batz Depo. 73-74).  Mueller advised he was having difficulty obtaining quotes for these repairs from outside contractors. (Batz Depo. 74).  Batz told him that the repairs needed to begin as soon as possible, and that they would check back with Mueller regarding the status of repairs on May 27, 2016. (Batz Depo. 74).

13.  Thereafter, at the Lodge maintenance man's request, Batz accompanied a sprinkler system contractor on a walkthrough of the building, identifying for the contractor the areas which needed repair. (Batz Depo. 75-76).

14.  On June 8, 2016, Batz informed the Lodge that he would conduct a follow up inspection on June 16, 2016. (DE 32-3, Ex. 3).  On June 13, 2016, Batz was informed by a different sprinkler system contractor, CT Fire, that it was proceeding with the work on the sprinkler system, and was performing an analysis of what was required to bring the system up to code. (DE 32-4, Ex. 4). Lori Dipersio, CT Fire's representative, stated they were still waiting for

hydraulic calculations but had replaced over 545 sprinkler heads and they

believed the system would operate as designed by June 16.  (*Id.*).

15.    On June 15, 2016, the Lodge's attorney, Andrew Treusch, e-mailed City

Attorney Robert Swaine ("Swaine"), requesting an extension of time to

complete the repairs without closing down the Lodge because of an important

sporting event the Lodge wished to host (the Heartland Triathlon).  Batz

testified that the mayor and city attorney pressured him to do "absolutely

anything [he] could do to keep them open, as long as they could do [the

Heartland Triathlon] event."  The Lodge's attorney stated that CT Fire

believed that in the event of a fire, the sprinkler system would activate as

designed, and allowing the Lodge to remain open would give it an opportunity

to increase its revenue. (DE 32-5).

16.    On June 16 and 17, Batz visited the Lodge and met with representatives of the

Lodge and CT Fire.  Based on the inspection, and the representations of CT

Fire, along with a detailed written proposal from CT Fire to complete all

necessary repairs in two weeks (DE 32-6), Batz agreed to a 30-day extension of

time to allow the Lodge "to work diligently to finish all required Life Safety

Codes issues." (DE 32-7).  Batz granted the extension with the expectation that

the revenue from the event would pay for some of the permanent repairs that

were required.  (Batz Depo. 77-80; 82-83).

17.    From May through October of 2016, Batz regularly attended meetings which

       included Administrator Scott Noethlich ("Noethlich") (Batz's direct supervisor),

       Mayor John Shoop ("Mayor Shoop"), Swaine, and one or more members of the

       City Council regarding the enforcement of the Fire Safety Code with regard to

       the Lodge.  Batz Decl., DE 32-1, ¶ 4.

18.    On July 28, 2016, Batz and Border conducted another inspection of the Lodge

       and found that there were still many unremedied code violations. (Batz Depo.

       101-102).  At this point, the hotel had remained open for two and one-half

       months since the fire on May 10, 2016, when it could have been closed at any

       time for the code violations.  Batz utilized his discretion to allow the Lodge to

       stay open in an effort to help the business make the necessary repairs to bring

       it into compliance with the Fire Safety Code. (Batz 102-103).

19.    Batz concluded that the Lodge was not making an effort to comply with the

       Fire Safety Code and inspection reports because the Lodge would hire a

       contractor, and then cancel the contract stating that they were going to use a

       different contractor.  (Batz Depo. 103-104).  For instance, for repair of the

       sprinkler system, the Lodge contracted with and then cancelled the contract

       with Critical System Solutions.  The Lodge then contracted with CT Fire

       Protection but that company was not paid and it withheld its inspection

       reports.  DE 32-8, DE 32-10, DE 32-12 to DE 32-16, DE 32-19.  A third company,

       Central Fire & Safety Equipment, submitted a proposal but they were not hired

by the Lodge.  DE 32-17, DE 32-18.

20.   Batz conducted another inspection of the Lodge on August 3, 2016. (DE 32-20).

At his request, he was accompanied by Fire Protection Specialist Richard

Witmer of the State Fire Marshall's office. (DE 32-21).  After finding numerous

unremedied violations of the Fire Safety Code, Batz drafted a letter to the

Lodge's management, giving them 7 days to hire a fire sprinkler contractor to

determine the status of the sprinkler system, or face condemnation of the

building.  (DE 32-22).  The draft letter was circulated to City administration,

Commissioner Lowrance ("Commissioner Lowrance") and Swaine.  Mayor Shoop

and Councilman Lowrance contacted Batz via email supporting the decision to

condemn the Lodge if it did not comply with the requisite Fire Safety Codes.

DE 32-23; Batz Depo. 121-124.

21.   At an August 5, 2016 meeting, a consensus was reached that if the Lodge failed

to hire a fire sprinkler contractor within seven days, the Lodge would be

condemned.  On that same day, Batz sent a certified letter to the Lodge,

indicating they were required to contract with a fire sprinkler contractor or

fire protection engineer to evaluate their fire sprinkler system and determine

if it was operational.  (Batz Depo. 107).  The City gave the Lodge until August

15, 2016 to comply with the requirements of the August 5th letter or face

condemnation.  DE 32-22.

22.   During this August 5, 2016 meeting, the decision was made to call the Lodge
      owners and inform them of the letter which was being sent out and the
      potential pending condemnation.  (Batz Depo. 212-214; Noethlich Depo. 52).
      City Administrator Noethlich provided the phone number to call Rahal and
      inform him of the decision.  (Batz Depo. 211-212; Noethlich Depo. 53).

23.   Batz testified that when Noethlich offered the Lodge's owner's phone number
      from his cell phone during the August 5th meeting, it "triggered me to start
      inquiring how the contacts were made.  And what contacts were made." (Batz
      Depo. 211-212).  The August 5, 2016 meeting was the first time Batz learned
      that Noethlich had been talking to Rahal, and that at the time, he asked
      Noethlich what they were discussing. (Batz Depo. 208).  Noethlich responded
      that he was discussing possible solutions or options for the Lodge.  At the time,
      Batz had no idea what Noethlich meant by this. (Batz Depo. 108-109).
      Noethlich testified in his deposition that he had Rahal's number in his
      telephone because he had called him two or three times. (Noethlich Depo. 53).

24.   Rahal initially contacted Noethlich complaining that his compliance efforts
      never satisfied Batz.  After that Noethlich initiated telephone conversations
      with Rahal.  (Noethlich Depo. 38).  Noethlich admits that he pursued the
      notion that the Lodge might be exempt as a historic building, and discussed it
      with Mayor Shoop and with Batz.  (Noethlich Depo. 32-33; 61).  When Noethlich
      pointed to a provision in the State Administrative Rules for a petition by the

Lodge for exemption, Batz rejected the idea as inconsistent with the National

Fire Prevention Code. (Noethlich Depo. 33).  Noethlich knew that the national

code had been adopted by reference in Florida and governs fire prevention

efforts in Florida. (Noethlich Depo. 34-35).

25.    After speaking with owner Mueller and others, Batz came to the conclusion

that Noethlich had been telling the Lodge's owners that they did not have to

comply with Batz's directives because the Lodge was a historic building and

there was a way to treat it as exempt from the Fire Safety Code requirements.

(Batz Depo. 109-112).  In Batz's mind, this explained the cycle of the Lodge

hiring and dropping contractors for the sprinkler system repair.  Batz inferred

that after hiring a contractor in response to an inspection, Lodge owners would

be told that they did not have to comply, due to the historic building

"exemption" or some other reason, and then cancel the contract with the

sprinkler company.  *Id*.  At his deposition, Mayor Shoop confirmed that Batz

complained that Noethlich was going behind his back and speaking to

management of the Lodge, telling them they did not have to comply with his

instructions.  (Shoop Depo. 44-46).  Batz testified:

. . . And I went to Mr. Noethlich and I asked him not do to it anymore.

Q. What was his response?

A. His response, he's just trying to find a simple solution. Then after it got to
where it was getting very, very bad, I asked the council and the mayor –

Q. When you say it was getting very, very bad, what do you mean by that?

. . . . . . . . . . .

A. Well, every time I would ask them to do something, the Kenilworth, they'd start.  Then they'd get a contractor.  Then they'd cancel it.  And we'd go to them and go, why did you just -- you just finally got somebody to start working on it.  Why are you canceling it?

[And the Kenilworth would respond,] We don't have to do anything.  We don't have to make these repairs.  We're exempt.  We're historic.  The City of Sebring told us we didn't have to do it.

So, I went to them [Noethlich and Swaine] again.  [The Lodge owners are] getting the wrong impression by you guys talking to them, whatever.  Again, hopeful, we've already been through the code 50 times to show it's not exempt.  It gives you alternate ways of achieving the bare minimum fire codes.

Q. So, your request -- if I'm understanding this correctly. Your request to Mr. Noethlich and Mr. Swaine, to not continue talking to Kenilworth, was after the Kenilworth initiated the lawsuit?[2]

A. Yes.  And then I also [complained to] the mayor and . . . the council members, [stating] ["]I thought I've asked you guys multiple times in Swaine's office, for your support on this.  Please have Mr. Noethlich stop talking to them.  Because every time he talks to them, they come back and let a contractor go, or they send a letter through [the Lodge's attorney] saying they're not doing this or not doing that.  It's undermining my authority.["]

(Batz Depo. 151:25 to 154:22).

26.    Fire Protection Engineer Michael B. Stevens, P.E., performed a detailed

inspection of the Lodge and filed a report concurring with Batz's decision to

condemn the building.  (DE 32-25 at 6).  In the Appendix to his report, Stevens

---

[2]  "The Kenilworth Lodge filed a lawsuit against the City, me, as an individual, and CT Fire, for when the building was condemned for occupancy."  Batz Depo. 134.

noted that for historic buildings, the Fire Safety Code allows the use of "equivalencies" which are "systems, methods, or devices of equivalent or superior quality, strength, fire resistance, or effectiveness," provided that technical documentation is submitted to the authority having jurisdiction to demonstrate equivalency, and the equivalency is acceptable to that authority. (DE 32-25 at 9).  For the City of Sebring, Batz, as fire chief, was the authority with jurisdiction.  (Noethlich Depo. 46).

27.   On approximately August 12, 2016, Batz, Mayor Shoop, Councilman Lowrance, Noethlich and Swaine met and agreed that if the Lodge failed to meet the August 15, 2016 deadline identified in the August 5th letter, the City would proceed with condemnation.  (Swaine Depo. at 26-27).

28.   Sometime after the August 12, 2016 meeting, Swaine learned of the Lodge's threat of bankruptcy from Noethlich, who reported that someone at the Lodge had said something like, "if you-all close us down, we'll have to file for bankruptcy, something like that." (Swaine Depo. 28-29).  Swaine then consulted bankruptcy counsel regarding the issue of whether condemning the hotel would violate federal automatic stay provisions under bankruptcy law. (Swaine Depo. 29).  The City Attorney was advised that a condemnation might violate an automatic stay, and if bankruptcy did become an issue, the City Attorney was instructed to contact separate bankruptcy counsel on the issue. *Id*.

29.  According to Swaine, the City was not concerned that condemnation of the

building would prompt the Lodge to file bankruptcy; rather, the concern was

that if the Lodge did file for bankruptcy, a condemnation might be in violation

of the automatic bankruptcy stay of all pending actions against the Lodge.

(Swaine Depo. 36-37).

30.  Swaine shared this information with Noethlich and requested that he be

contacted if bankruptcy was brought up in the condemnation process. (Swaine

Depo. 30).

31.  According to Noethlich's deposition testimony, Swaine advised him to hold off

on the condemnation due to the potential of a filing for bankruptcy by the

Lodge.  (Noethlich Depo. 73-74).  Noethlich's testified as follows:

> . . . I must have had a conversation with Bob Swaine that
> might have said, might have said that you may want to
> hold off on condemnation because of the potential for
> them to file some type of bankruptcy, and I don't know
> what that does to the process.
>
> Q: Okay. That – and that was your conversation with
> Attorney Swaine.
>
> A: Right.

(Noethlich Depo. 74).  After that Noethlich called Batz and "probably relayed

the exact same verbiage." (Noethlich Depo. 75).  Noethlich testified:

> I might have had a conversation with the Chief that said we
> may have to hold off on condemnation because of the
> bankruptcy issue that, that – that impact of them perhaps
> filing for bankruptcy and what that may have.  That, that's

what it looks like to me.

Q: Okay, I understand.

A: That would be my recollection.

(Noethlich Depo. 76-77).

32.   On August 15, 2016, the last day allotted for the Lodge to produce

documentation on its fire protection status, Noethlich, at Swaine's request,

called Batz and relayed the information about potential concerns with the

Lodge filing for bankruptcy.  (Swaine Depo. 29-30).

33.   After his telephone conversation with Noethlich on August 15, 2016, Batz sent

an e-mail to Noethlich, with copies to Councilman Lowrance, Mayor Shoop and

another City official.  The email exchange states:

Sent: Monday, August 15, 2016 4:09 PM

Subject: Direction

Mr. Noethlich

As per our phone conversation today, I am formally requesting
clarification in writing as to the actions to be taken with the Kenilworth
Lodge.

To re-cap, Friday August 5, 2016 a meeting was held at Mr. Swaine's
office to discuss the current issues with the Kenilworth Lodge.  A letter
was written (by Mr. Swaine and I) stating that as of Monday August 8th
they would have 7 days to hire a fire sprinkler contractor or engineer
and provide us a letter stating that the fire protection system was
operable or non-operable.  This was discussed and agreed by everyone in
the meeting.  This was discussed with one of the owners in the meeting
and one of the owners on speaker phone that Mr. Noethlich contacted.

Friday August 12, 2016 another meeting was held at Mr. Swaine's office and it was discussed that the fire protection contractor stated in an email that they would not come to the property until August 16th and what we would or would not do regarding the Kenilworth Lodge if they did not meet the deadline of August 15, 2016 set forth in the August 5th letter.  In this meeting everyone agreed that if the deadline was not meet [sic], that we would condemn the building for occupancy until a contractor or engineer would confirm that the fire protection system was or was not operable.

As per our phone conversation I am confused now.  I am of the understanding from you, that City Administration and City Legal have had conversations regarding this issue that I have not been part of and that we are not following through with what we discussed and agreed upon.

With that, I am formally requesting that the City of Sebring advise me in writing as to the step by step procedures that it wishes for me to follow not to mitigate this issue.

If the deadline is not meet [sic] as per the August 5th letter by August 15th, as per the letter, what actions should I take?

34.   Noethlich understood that in this e-mail Batz was accusing him of not following

through on condemning the Lodge as they had previously agreed to do.

(Noethlich Depo. 77).  Noethlich discussed Batz's e-mail with Swaine and they

decided to go ahead and condemn the building as originally planned.

(Noethlich Depo. 78).

35.   Noethlich wrote back to Batz stating

Sent: Monday, August 15, 2016 4:35 PM

Chief,

I believe I was quite clear and nothing has changed from Friday.  I believe you are confusing support with the provision of an option.  As

outlined in your email, please proceed forth in condemning the building for occupancy as described in paragraph three (3) of your email. Additionally, should the property owner broach the topic of bankruptcy tomorrow, please contact [the City Attorney].

DE 25-1 at 58-59 (Ex. 10).

36.   The Lodge never filed for bankruptcy.  (Swaine Depo. 33).

37.   Batz has filed a declaration wherein he states that

on the afternoon of August 15, 2016, Noethlich came to the fire house and asked me if there was anything I can do to avoid closing the Kenilworth.  He stressed how big a deal it was to close the Kenilworth and that he felt they should have exemptions as a historic building.  I said they have serious issues that I am not taking lightly and that people would die if a fire were to get going in the building and this had to happen until they fixed the issues."

DE 32-1, ¶ 7.

38.   As of close of business on August 15, 2016, the Lodge had not submitted any

documentation regarding the status of the fire sprinkler system.

39.   Just before going to condemn the Lodge on August 16, 2016, Noethlich called

Batz to a meeting.  (Batz Depo. 115).  Present at the meeting was Noethlich,

Border, Swaine, and Stewart (the 49% owner of the Lodge).  (Batz Depo.

114-115).

40.   Stewart "was very agitated with me [Batz], because I was going to condemn his

business." (Batz Depo. 115-116); (Border Depo. 29).  Stewart "went off on the

Chief," asserting the condemnation was Batz's fault because the property had

not been cited for 20 years and all of a sudden his property was being

condemned.  (Noethlich Depo. 83-84).  Batz told him (either at this meeting or before) that the repairs were being required now because the dangerous conditions were revealed in the May, 2016 inspection after a fire there. (Noethlich Depo. 84).  Stewart asked if there was anything that could be done to avoid condemnation and Batz said "no" - he had already granted three or four extensions expecting the Lodge to begin repairs with the proceeds from the events the extensions were granted for, but the Lodge owners did not keep their word to begin making repairs.  (Batz Depo. 115-120).  Batz did agree to revisit the situation after the Lodge had made some repairs. (Batz Depo. 116).

41.     Because the Lodge had not complied with the City's requests and had not submitted the appropriate fire safety documentation, the property was formally condemned on August 16th by Batz and Border, by serving the appropriate notice to Ralph Negron and posting the notices on the building. (Batz Depo. 116-117).  Over a year and a half later, the Lodge remains closed. (Batz Depo. 204).

42.     Unrelated to the condemnation of the Lodge, the City received complaints and concerns expressed over time by six owners and operators of properties which were subject to Batz's fire inspections and were required to take actions to bring their properties into compliance with the Fire Safety Code.  (Batz Depo. 91-93).  Mayor Shoop received complaints from local business owners regarding Batz's demeanor, rudeness and overall attitude during fire inspections,

separate and apart from any concerns regarding the substance of the inspection.  (DE 21-5, Shoop Decl. ¶¶ 3-5).  These complaints involved the owner of the night club El Bravo (Noethlich Depo. 23-24), the organizers of the Heartland Triathalon including former Commissioner Greg Harris (Shoop Depo. 12; 35), warehouse owner Don Maddox (Shoop Depo. 31-32), the owners of the Love Bug convenience store (Shoop Depo. 33-34), building owner Lisa Sanatono (Shoop Depo. 36), and the Kenilworth Lodge (Noethlich Depo. 83-84).  There were no written reports or other records made regarding any of these complaints.  (Noethlich Depo. 27).

43.   City Council members also received numerous complaints about Batz's demeanor and attitude from his subordinate firefighters. (Councilman Lowrance Decl. ¶¶ 8-12).

44.   Pursuant to the Charter for the City of Sebring, department heads, such as the Fire Chief, can only be discharged by a majority vote of the City Council.  (DE 21-5, Shoop Aff. ¶ 9).  The Mayor does not vote on the issues brought before the City Council, including the termination or appointment of department heads, and can only make recommendations to the Council.  *Id.*

45.   On December 6, 2016, at a City of Sebring City Council meeting, Mayor Shoop read a statement regarding his recommendation to terminate Batz's employment.  (Shoop Aff. ¶ 10, Ex. A).  Present from the City Council at the time were Scott Stanley, Charlie Lowrance, Lenard Carlisle, and Bud Whitlock.

The City Council discussed the issue and each Councilmember then independently voted to terminate Batz.  (Batz Depo. 196-197; Shoop Aff. ¶ 10; DE 21-1 Lowrance Aff. ¶ 14; DE 21-2 Carlisle Aff. ¶ 9; DE 21-4 Stanley Aff. ¶ 7).  Councilman Mark Stewart did not attend the December 6, 2016 meeting and did not vote on the decision to discharge Batz.  (DE 21-3 Stewart Aff. ¶ 6).

46.     Neither City Administrator Noethlich nor Mayor Shoop had any vote on whether to terminate Batz's employment.  (Batz Depo. 197-198).  Batz does not allege Councilmembers Carlisle, Whitlock or Stanley had any issue with his decisions regarding the Lodge.  (Batz Depo. 198-200).

47.     On November 7, 2016, Batz was placed on administrative leave with the City.  (Batz Depo. 187).

**Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  *Rice-Lamar v. City of Ft. Lauderdale,* 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

In response, the nonmoving party must "go beyond the pleadings" and identify competent record evidence showing the existence of a genuine, material factual dispute for trial. *Celotex Corp.*, 477 U.S. at 324.  Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the non-movant, and in order for factual issues to be genuine, they must have a real basis in the record.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  An issue of fact is material if, under the governing substantive law, it might affect the outcome of the case.  *See Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the Court views the evidence, and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  Where reasonable minds could differ regarding inferences to be drawn from undisputed facts, summary judgment will be denied.  *See Miranda v. B & B Case Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).  Ultimately, the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1318 (11th Cir. 2016) (quoting *Anderson*, 477 U.S. at 251–52).

<u>Discussion</u>

<u>First Amendment Retaliation Claims</u>

"Speech by citizens on matters of public concern lies at the heart of the First Amendment ...." *Lane v. Franks,* 134 S. Ct. 2369, 2377 (2014). It is beyond dispute that, although public employees accept certain limitations on their freedoms, they retain a clearly established right to speak as citizens on matters of public concern. *See, e.g., id.; Garcetti v. Ceballos,* 547 U.S. 410, 420 (2006) ("*Garcetti*"); *Connick v. Myers,* 461 U.S. 138, 151 (1983) ("*Connick*"); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968) ("*Pickering*"). It is also beyond dispute that a public employer may not retaliate against public employees for speech that is protected by the First Amendment. *See Rankin v. McPherson*, 483 U.S. 378, 383 (1984); *see also Alves v. Board of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015). However, the First Amendment does not permit public employees "to 'constitutionalize the employee grievance,'" *Garcetti*, 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154); moreover, speech that "owes its existence" to the public employee's professional responsibilities is not constitutionally protected. *Id.* at 421; *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). Indeed, a plaintiff does not speak on a matter of public concern if the purpose of his complaint, even though raising issues of public concern, is personal and expresses concerns about non-compliance that negatively impacts plaintiff's ability to perform his job. *Griffin v. Sun N'Lake of Sebring Improvement Dist.*, Case No. 16-CV-14062, 2017 WL 3835878

at *8 (S.D. Fla. 2017).

Here, Batz claims that the City voted to terminate his employment as Fire

Chief in retaliation for him exercising his federal constitutional rights under the First

Amendment.  Batz asserts his protected speech consisted of:

- his repeated oral objections to the City's Attorney, Administrator and Council Members regarding their attempts to undermine and delay his efforts to enforce the Fire Safety and Life Safety Codes with respect to the Kenilworth Lodge, thereby creating risk of injury or death in the event that a fire were to break out in the Lodge.

- his August 15, 2016 written objection to the City's attempts to avoid and delay the condemnation, thereby putting members of the public at risk of injury or death in the event that a fire were to break out in the Lodge.

- his attendance and comments to the same effect at meetings called by the City Administration, on August 23 and September 22, 2016, to review his complaints that the City in general and Councilman Carlisle in particular were not supporting and did not "have his back" in the Kenilworth matter.

DE 31 at 6-7.

The Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), explained that

its decision in *Pickering* "identif[ies] two inquiries to guide interpretation of the

constitutional protections accorded to public employee speech":

> *The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.*  If the answer is yes, then the possibility of a First Amendment claim arises.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Garcetti*, 547 U.S. at 418 (internal citations omitted, emphasis added).[3]  *See also,*

*King v. Board of County Commissioners*, – F.3d –, 2019 WL 988467, at *5 (11th Cir.

March 1, 2019) (Plaintiff "spoke pursuant to her official duties, the purpose of her

speech was work-related, and she never spoke publicly.  When viewed together,

these factors paint a clear picture of a person speaking as an employee and not as a

private citizen.")

"The first step in determining whether a plaintiff has a viable First Amendment

retaliation claim is whether the plaintiff's speech 'was made as a citizen.'"  *Id.*

quoting *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015).  Batz

asserts that there are genuine issues of material fact as to whether he spoke as a

citizen in objecting to City officials' purported obstruction of the enforcement of the

Fire Safety Codes:

> The speech for which Plaintiff was fired was not a complaint about his
> own employment situation, but rather [a] complaint that Defendant was
> interfering with the enforcement of the State Fire Safety and Life Safety
> Codes, which interference put the public in danger.  It was not part of
> his ordinary job duties.  The one written complaint in the record - the e-
> mail of August 15, 2016 - is not a complaint about the treatment of
> Plaintiff as an employee, but rather is about the attempt to delay the
> enforcement action due to the threat of bankruptcy.[4]

---

[3]  In *Garcetti*, a district attorney alleged that he was retaliated against for
speaking out about an allegedly faulty warrant, but the Supreme Court determined
that the district attorney's speech was not protected.  "The controlling factor [was]
that his expressions were made pursuant to his duties as a calendar deputy."
*Garcetti*, 547 U.S. at 421.

[4]  *See, infra*, finding the August 15, 2016 e-mail cannot be said to be a written
complaint under the FWA.

DE 31 at 6-7.  Batz asserts his objections to City administration's perceived

interference with his efforts to enforce the Fire Safety Code, especially made during

Council meetings, was speech by a citizen on a matter of public concern because it

was "not 'part of what he, as a [Fire Chief], was employed to do.'" citing *Garcetti*,

547 U.S. at 421.

The Supreme Court in *Garcetti* explained that the line between speaking as a

citizen or as a public employee turns on whether the speech "owes its existence to a

public employee's professional responsibilities."  547 U.S. at 421–22.  If the speech

does, then "[r]estricting [it] ... does not infringe any liberties the employee might

have enjoyed as a private citizen.  It simply reflects the exercise of employer control

over what the employer itself has commissioned or created."  *Id.; see also Boyce v.*

*Andrew,* 510 F.3d 1333, 1342–43 (11th Cir. 2007) (collecting cases "[f]ollowing

*Garcetti*" which interpreted the phrase "owes its existence to").  In *Lane v. Franks*,

573 U.S. 228 (2014), the Supreme Court clarified what it meant in *Garcetti* when it

used the phrase "owes its existence to":

> [T]he mere fact that a citizen's speech concerns information acquired by
> virtue of his public employment does not transform that speech into
> employee — rather than citizen — speech.  The critical question under
> *Garcetti* is whether the speech at issue is itself ordinarily within the
> scope of an employee's duties, not whether it merely concerns those
> duties....

*Id*. at 2379.  The Eleventh Circuit subsequently explained that "[a]fter *Lane,*"

*Garcetti's* phrase "owes its existence to ... must be read narrowly to encompass

speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1162, 1164-65 (11th Cir. 2015), *cert. denied*, – U.S. –, 136 S.Ct.1838 (2016) ("*Alves*") (finding that because employees drafted a memorandum documenting their superior's poor leadership in order to correct conduct that interfered with their official duties, they penned it pursuant to those duties).  In considering whether Batz's speech was part of his ordinary job duties, the question is not "whether the speech itself is made ordinarily or regularly." *King*, 2019 WL 988467 at *6 quoting *Fernandez v. Sch. Bd. of Miami-Dade Cty., Fla.*, 898 F.3d 1324, 1333-34 (11th Cir. 2018).  "Rather, we inquire whether the speech falls within an ordinary duty." *Id.*

> For example, in *Boyce,* two employees at the Department of Family and Children Services complained to their supervisors about the size of their caseloads, which they viewed to be the result of mismanagement of internal administrative affairs.  The plaintiffs were case workers; they were responsible for investigating the cases of children allegedly at risk and making recommendations to their supervisors.  Still, we found that the plaintiffs spoke "pursuant to [their] employment responsibilities" in reporting conduct that affected the plaintiffs' ability to manage their cases, close cases, and meet deadlines.  In other words, *in reporting conduct that interfered with their ordinary job duties, the plaintiffs in Boyce spoke pursuant to those duties.*

*Alves*, 804 F.3d at 1165 (citations omitted, emphasis added).  The Court sees no difference here.  The Eleventh Circuit has specifically articulated that when speech is made, as it was in this case (objecting to conduct that interfered with Batz's job

duties), it owes its existence to his professional responsibilities to enforce the Fire

Safety Code.

Moreover, Batz never engaged in speech outside of his work.  Batz's speech

was made privately and precisely to the appropriate persons in his chain of command.

"In *Morgan v. Ford*, 6 F.3d 750[, 755] (11th Cir. 1993), we relied in part on the fact

that the plaintiff 'in no way dr[ew] the public at large or its concerns into the

picture' and concluded that the plaintiff's speech was not protected."  *King*, 2019 WL

988467 at *8.  In combination with other aspects of his speech, the lack of public

dissemination reinforces that he was an employee discussing employment-related

matters, not a private citizen engaging in protected speech.  *Id*.

Pursuant to the precedent cited above, Batz spoke as an employee, not as a

citizen, raising an employment-related concern, in an employment setting.  As such,

his oral and written objections and complaints do not implicate the First Amendment.

*Alves*, 804 F.3d at 1149; *King*, 2019 WL 988467 at *6; *Griffin*, 2017 WL 3835878 at *8.

**Florida Whistle-blower's Act**

Florida's Whistle-blower's Act ("FWA") prohibits, in pertinent part, state and

local agencies from retaliating against an employee for disclosing a suspected

violation of law by another employee or agent, which produces a substantial and

specific danger to the public's health, safety, or welfare.  *See* Fla. Stat. §§

112.318(5)(a), 112.3187(2)-(7) (2009); *Addison v. Fla. Department of Corrections*, 683

F.App'x 770, 775 (11th Cir. 2017); *Rice-Lamar v. City of Fort Lauderdale*, 853 So.2d

1125, 1131–32 (Fla. Dist. Ct. App. 2003).

In Count I and II of the Complaint, Plaintiff alleges he was fired for reporting on and objecting to interference with his compliance measures in violation of Florida Statute § 112.313(6), Standards of Conduct for Public Officers, Employees of Agencies, and Local Government Attorneys; Misuse of Public Position.  This section provides,

> No public officer, employee of an agency, or local government attorney shall *corruptly*[5] *use* or attempt to use his or her official position or any property or resource which may be within his or her trust, or perform his or her official duties, to secure a special privilege, benefit, or exemption for himself, herself, or others. . .

(Emphasis supplied.)  He asserts that Mayor Shoop, Councilman Stewart, Swaine, and Noethlich corruptly used their positions in an effort to secure an exemption from the Fire Safety Code for the Lodge, which would have created an unnecessary risk to life and property of occupants of the Lodge.  Compl. ¶ 47, 54.

---

[5]  "Corruptly means done with a wrongful intent and for the purpose of obtaining, or compensating or receiving compensation for, any benefit resulting from some act or omission of a public servant which is inconsistent with the proper performance of his public duties."  Fla Stat. § 112.312(9).  To satisfy this statutory element, proof must be adduced that the conduct complained of be done with a wrongful intent, and that the Defendant acted with reasonable notice that his conduct was inconsistent with the proper performance of his public duties and would be a violation of the law or the code of ethics.  *Bennett v. Comm'n on Ethics*, 871 So.2d 924, 926 (Fla. Dist. Ct. App. 2004) citing *Blackburn v. State Comm'n on Ethics*, 589 So.2d 431, 434, 436 (Fla. Dist. Ct. App. 1991); *see also Tenney v. State Comm'n on Ethics*, 395 So.2d 1244, 1246 (Fla. Dist. Ct. App. 1981); *Kinzer v. State Comm'n on Ethics*, 654 So.2d 1007, 1010 (Fla. Dist. Ct. App. 1995).

In Counts III and IV of the Complaint, Plaintiff alleges that he was terminated for disclosing misfeasance and malfeasance in violation of the FWA which provides in pertinent part that an agency shall not dismiss an employee for disclosing information regarding any act or suspected act of malfeasance or misfeasance.  Fla. Stat. § 112.3187 4(a), 5(b).

If someone blows the whistle on a suspected misuse of a public position, and that employee is then discharged, they may bring an action for retaliatory discharge under the Whistle-blower Act if: (1) the plaintiff engaged in statutorily protected expression; (2) the plaintiff suffered an adverse employment action; and (3) there is some causal connection between the two events.  *Florida Dep't of Children & Families v. Shapiro*, 68 So.3d 298, 305–06 (Fla. Dist. Ct. App. 2011).  The causal link element is construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Rice-Lamar,* 853 So.2d at 1132–33 (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)).  The Whistle-blower Act "is remedial in nature and should be construed liberally in favor of granting access to the remedy so as not to frustrate the legislative intent" of preventing retaliatory action against employees and persons who disclose certain types of government wrongdoing to appropriate officials.  *Rice-Lamar*, 853 So.2d at 1132 (citations omitted).  Whether Batz engaged in statutorily protected expression is contested.

The Eleventh Circuit has held that "the summary judgment analysis for a Title VII retaliation claim should be applied to a claim for retaliatory discharge under the Florida Whistle-blower Act."  *Rutledge v. SunTrust Bank*, 262 F.App'x 956, 958 (11th Cir. 2008) (citations omitted); *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950-51 (11th Cir. 2000) ("*Sierminski*").  Because Florida applies the Title VII analysis to retaliatory discharge under the Whistle-blower Act, the burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), applies.

> Under the *McDonnell Douglas* framework, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of unlawful discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff successfully presents a prima facie case, the defendant employer has the burden of producing evidence of some "legitimate, nondiscriminatory reason" for the adverse employment action.  *Id*. at 802.

*Byrd v. BT Foods, Inc.*, 948 So.2d 921, 927 (Fla. Dist. Ct. App. 2007); *Rustowicz v. North Broward Hosp. Dist.*, 174 So.3d 414, 419-20 (Fla. Dist. Ct. App. 2015).  If the defendant carries its burden of producing some legitimate nondiscriminatory reason for its employment action, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason is pretext for prohibited retaliatory conduct.  *Sierminski*, 216 F.3d at 950.

**Statutorily Protected Expression**

The FWA sets forth several specific requirements regarding the types of disclosures protected, to whom those disclosures must be made, and who is protected.  Fla. Stat. § 112.3187, *et seq*.  In order to qualify as a "protected

disclosure" the actual information disclosed must concern, in pertinent part, EITHER:

> (a) A violation or suspected violation of any state law which creates and presents a substantial and specific danger to the public's health, safety, or welfare.  (Counts I and II.)

§ 112.3187(5)(a), Fla. Stat. (2011).

OR

> (b) Any act or suspected act of malfeasance or misfeasance committed by an employee or agent of an agency.  (Counts III and IV.)

§ 112.3187(5)(b), Fla. Stat. (2011).

As for subsection (a) above, Batz alleges in Counts I and II that he disclosed, both orally and in writing, that Mayor Shoop, Councilman Stewart, Swaine, and Noethlich <u>corruptly</u> used their positions in an effort to secure an exemption from the Fire Safety Code for the Lodge, which would have created an unnecessary risk to life and property of occupants in violation of Florida Statute §§ 112.313(6), 112.3187(5)(a).  Compl. ¶ 47, 54.

As for subsection (b) above, Batz alleges in Counts III and IV that he disclosed, both orally and in writing, that Mayor Shoop, Councilman Stewart, Swaine, and Noethlich acted with misfeasance or malfeasance when they interfered with his enforcement of, and attempted to secure an exemption from, the Fire Safety Code for the Lodge, in violation of Florida Statute § 112.3187(5)(b).  Compl. ¶¶ 59-60, 65-66.

In addition to protecting the disclosure of only certain specific information, as discussed above, a complainant must also allege that the disclosure was made in one

of a number of specific ways.  Relevant to this case, Batz's disclosures must have been made in a "written and signed complaint" upon the employee's own initiative (Counts II and IV), or when Batz was "requested to participate in an investigation, hearing, or other inquiry conducted by any agency" (Count I and III).  Fla. Stat. § 112.3187(7) (2011); *Shaw v. Town of Lake Clarke Shores*, 174 So.3d 444, 446 (Fla. Dist. Ct. App. 2015).

**Written and Signed Complaint (Counts II and IV)**

For evidence of a written and signed complaint, Batz relies on his August 15, 2016 email with the City Administrator as the basis for his allegation that he disclosed that Mayor Shoop, Councilman Stewart, Swaine, and Noethlich corruptly used their positions (Count II) and acted with misfeasance or malfeasance (Count IV) in an effort to improperly secure an exemption from the Fire Safety Code for the Lodge.

The August 15 email exchange begins with Batz "requesting clarification in writing as to the actions to be taken with the Kenilworth Lodge."  Batz summarizes the previously agreed-upon course of action to proceed with condemnation of the Lodge on August 16, 2016, if the Lodge failed to meet specific goals in meeting its obligations under the Fire Code.  Batz then recaps a phone conversation with the City Administrator from earlier in the day in which Noethlich advised Batz to immediately contact Swaine if the Lodge mentions that it has filed for bankruptcy.  Specifically, the email states:

> As per our phone conversation I am confused now.  I am of the
> understanding from you, that City Administration and City Legal have
> had conversations regarding this issue that I have not been part of and
> that we are not following through with what we discussed and agreed
> upon.
>
> With that, I am formally requesting that the City of Sebring advise me in
> writing as to the step by step procedures that it wishes for me to follow
> not to mitigate this issue.
>
> If the deadline is not meet [sic] as per the August 5th letter by August
> 15th, as per the letter, what actions should I take?

UMF ¶ 33.  In response to Batz's inquiry regarding his confusion as to whether to

proceed with condemnation, Noethlich responded:

> I believe I was quite clear and nothing has changed from Friday.  I
> believe you are confusing support with the provision of an option.  As
> outlined in your email, please proceed forth in condemning the building
> for occupancy as described in paragraph three (3) of your email.
> Additionally, should the property owner broach the topic of bankruptcy
> tomorrow, please contact [the City Attorney].

UMF ¶ 35.

On its face, this email exchange cannot be said to even broach corrupt misuse

of position, or malfeasance or misfeasance.  Such comments do not rise to the level

necessary to qualify as a disclosure under the FWA because no violation of law, or act

of malfeasance or misfeasance can be gleaned from Batz's email as required by §

112.3187(5), Fla. Stat. (2011).  *See, e.g., Trzcinka v. Ramirez*, Case No:

15–CV–1055–Orl –31DCI, 2016 WL 6524411, at *3 (M.D. Fla. 2016) (email from Plaintiff

expressing frustration regarding job opportunities and hiring processes was routine

office communication and did not constitute disclosure under the FWA).

Because the FWA "is to be construed liberally," Batz "is not required to use formal legalistic language in order to lodge a complaint that invokes whistleblower protection." *King v. State of Fla.*, 650 F. Supp. 2d 1157, 1163 (N.D. Fla. 2009); *Irven v. Dep't of Health & Rehab. Servs.*, 790 So.2d 403, 405 (Fla. 2001). No matter how liberally the content of his email is construed, however, it cannot be said to be a written complaint regarding efforts to improperly secure an exemption from the Fire Safety Code for the Lodge. Batz is not complaining about the City's failure to act, he is expressly seeking clarification on how to proceed if the Lodge failed to meet the previously set deadline.

Based on the record evidence in this case, Batz has failed to raise a genuine issue of material fact as to whether he lodged a written complaint in his August 15 email exchange with Noethlich. Thus, the City is entitled to summary judgment on this aspect of Batz's FWA claim (Counts II and IV).

## Oral Complaints at Hearing or Inquiry (Counts I and III)

### *Count I*

In Count I, Batz alleges that the City violated the FWA by discharging him in retaliation for his oral objections to City officials' <u>corruptly using their position</u> to secure a special exemption for the Lodge in violation of Fla. Stat. § 112.313(6). Batz relies on oral statements he made at "inquiries conducted by the City regarding his complaints, on August 23, 2016 and again on September 22, 2016. Fla. Stat. §

112.3187(7)."[6]  DE 31 at 6-7.

The City argues summary judgment should be granted in its favor asserting, among other things, that Batz cannot establish that he engaged in statutorily protected activity because his only complaint was that the City Administrator (and other City elected officials, generally) interfered with his efforts to bring the Lodge up to code by communicating with representatives of the Lodge outside of his presence in an effort to exempt the Lodge from provisions of the Florida Fire Safety

---

[6]  The City asserts in its reply, with no legal support, that the meetings on August 23, 2016 and September 22, 2016 "cannot properly be characterized as an investigation, hearing, or other similar inquiry," and were rather "informal workplace meetings" to discuss the status of the Lodge's compliance with the fire code and its eventual condemnation for failing to meet those obligations.  The City asserts, "[i]ndeed, if the Plaintiff's broad interpretation of the law were adopted, then any workplace meeting where an employee provided input would constitute whistleblower activity."

The only case the Court could find that dealt with this question suggests differently.  *See, Jones v. School Bd. of Orange County, Fla.*, No. 604CV540ORL31KRS, 2005 WL 1705504 (M.D. Fla. Jul. 20, 2005).  There, the plaintiff was requested to participate in a meeting with management.  *Id.* at *3.  It was stressed to the plaintiff that the meeting was "troubleshooting" in nature and was not disciplinary.  *Id.*  The plaintiff made her purported whistle-blower disclosures during that meeting, and the court noted, without ruling, that the troubleshooting meeting with management may have been an "inquiry" as defined in § 112.3187(7), Florida Statutes.  *Id.* at *10.

The parties paint very different pictures of the meetings they had regarding the Lodge.  Batz avers that it was highly unusual for him to meet with the City regarding the condemnation of a building, and that he was summoned to meetings on August 23, 2016 and September 22, 2016 to respond to the City's inquiries regarding his complaints of interference.  The City characterizes the meetings as informal ordinary work place meetings where Batz's "input" was solicited.  The Court finds that questions of fact are involved and that summary judgment cannot be granted on the City's argument that Batz cannot establish a statutorily protected activity for Counts I and III because his complaints were not made during an investigation, hearing, or other inquiry.

Code.  The City argues that nothing in Sections 112.313 or 112.3187 prohibit a City Administrator and City Attorney from communicating with representatives of a building, that is in violation of the Fire Safety Code, outside the presence of the Fire Chief.

Here, the extent of Batz's evidence regarding Noethlich's alleged corruption is that Noethlich discussed with the Lodge owners, on a few occasions, the possibility that the Lodge might be exempt from the current Fire Safety Code, and that he advocated for finding a way that the Lodge might not be condemned.  However, Batz points to no law, policy or ethics code that prohibited Noethlich from communicating with the Lodge owners regarding compliance with or exemptions to the Fire Safety Code.

Notably, the record is devoid of any facts that infer that Noethlich's discussions and advocacy were motivated by any improper purpose.  No payment or exchange of a benefit is alleged.[7]  Batz has no evidence that suggests that Noethlich acted "corruptly," or with reasonable notice that his conduct would be a violation of a law, policy or code of ethics.  Other than pointing to Noethlich's acknowledgment that Batz was the final authority on compliance with the Fire Safety Code, Batz points to no law, policy, established procedure or ethics code that suggests that exploring

---

[7]  Even if Stewart, as a part owner of the Lodge, could have benefitted from the Lodge not being condemned, Batz has not presented any evidence that Stewart had a role in his discharge.

exemptions to the Fire Safety Code or expressing an opinion that "it would be a big deal if the Lodge was condemned," is wrongful.  Even if the Noethlich and Swaine were "undermining his authority by telling the Lodge owners that they did not need to comply with Batz's directives on the remedies that were required to bring the building up to code," there is not even a scintilla of evidence to support the notion that Noethlich and Swaine *corruptly* used their positions to secure an exemption for the Lodge, which was condemned as scheduled.  There is no evidence in the record that raises a genuine issue of material fact as to Noethlich's or Swaine's corrupt intent.  In the end, Noethlich told Batz to go ahead and condemn the property on the scheduled day, and Batz did so.  The Court concludes that there is no competent evidence to support a jury determination that Noethlich (or any other City official) acted corruptly.  *Kinzer v. State Com'n on Ethics*, 654 So.2d 1007, 1010 (Fla. Dist. Ct. App. 1995); *Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1580 (11th Cir. 1988).

**Count III**

As discussed previously, under the relevant portions of the FWA, a protected activity must disclose "[a]ny act or suspected act of malfeasance [or] misfeasance ... committed by an employee or agent of an agency."  Fla. Stat. § 112.3187(5)(b).  Neither malfeasance nor misfeasance is defined in the statute, but Florida courts have construed malfeasance to mean "the doing of an act which a person ought not do at all" and misfeasance to be "the improper doing of an act which a person might lawfully do."  *Rosa v. Dep't of Children & Families*, 915 So.2d 210, 212 (Fla. Dist. Ct.

App. 2005) ("*Rosa*") (citing *Irven v. Dep't of Health & Human Servs.*, 790 So.2d 403, 405 (Fla. 2001) ("*Irven*")).  For purposes of summary judgment, under Florida law, if the content of a disclosure could create reasonable inferences of malfeasance or misfeasance, the issue of whether it has done so presents a factual matter for the jury.  *See id*.

In Count III, Batz alleges that his complaints at the meetings primarily concerned Noethlich's misfeasance by interfering and undermining his enforcement efforts to make the Lodge safe.  Indeed, Mayor Shoop testified that Batz complained that Noethlich was going behind his back and speaking to management of the Lodge, telling them they did not have to comply with his instructions.  (Shoop, 44-46).

When considering what might be considered misfeasance or malfeasance, the Court must interpret the meaning liberally.  *See Irven*, 790 So.2d at 405 (holding that the Whistle-blower's Act "is remedial and should be given a liberal construction").  Misfeasance has been held to include negligent acts committed by an employee of an agency.  *Rosa*, 915 So.2d at 212.  Although Batz's complaints could be construed as "ranting" about personal conflicts with Noethlich, there are also different reasonable inferences that could be drawn from Batz's position that Noethlich (Swaine, Mayor Shoop and Stewart) negligently interfered with his efforts to bring the Lodge up to Code.  Construing all facts in favor of Batz, the Court will assume for purposes of this discussion, that a reasonable jury could draw the inference that Noethlich's conversations with Lodge owners regarding exemptions to the Fire Safety Code

represented misfeasance or malfeasance on the part of Noethlich.  As such, a triable

issue of fact exists as to whether Batz's oral complaints about City actors

undermining his efforts to make the Lodge safe amounts to a protected activity.  See

*Rosa*, 915 So.2d at 212.   Having established a prima facie case for protected activity

in Count III, the burden shifts to the City to put forth a legitimate reason for the

adverse employment action. *McDonnell Douglas,* 411 U.S. at 802; *Sierminski*, 216 F.3d

at 950; *Burden v. City of Opa Locka*, 2012 WL 4764592, at *14 (S.D. Fla. 2012).

**Discharge**

The City must now articulate some legitimate, non-retaliatory reason for

having fired Batz.  "[T]o satisfy this intermediate burden, the [City] need only

produce admissible evidence which would allow the trier of fact rationally to

conclude that the employment decision had not been motivated by [retaliatory]

animus." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 257 (1981)

("*Burdine*").

It is undisputed that termination of a department head is achieved through a

majority vote of City Council, and it was the unanimous vote of the four Council

members present at the December 6, 2016 meeting which resulted in Batz's

termination.[8]  Accordingly, Batz must address the potential pretext of these four

---

[8]  It is worth noting that the individuals Batz complained about -- Noethlich,
Stewart, Swaine and Mayor Shoop – were not decisionmakers who voted on Batz's
employment.

decision makers.

The decision to terminate Batz's employment was a result of a vote of four independent[9] City Council members, three of whom have iterated their reasons for termination.  The City has not presented any evidence regarding the fourth Councilman, Bud Whitlock, who apparently also voted to terminate Batz.

Councilman Charles Lowrance filed an affidavit averring that his decision to vote in favor of Batz's termination was because he did not think Batz was an effective Fire Chief, and that his decision had nothing to do with issues related to the Lodge. DE 21-1, ¶¶ 3, 14.  He averred that he voted in favor of Batz's termination "because Batz was unable to retain firefighters and to fill empty firefighter positions[,] and because Batz was difficult to work with."  *Id*. ¶ 14.  "The bottom line was that Batz was rude to members of the community and a bully to his own firefighters and it was causing problems for the Department."  *Id*. ¶ 6.

Councilman Lenard Carlisle filed an affidavit averring that his decision to vote in favor of Batz's termination was not related to any issues with the Lodge, but was based on Batz's poor attitude toward City firefighters and those in the community, in addition to Batz's treatment of Carlisle at the Sebring Thunder Event.[10]  DE 21-1 ¶¶ 4,

_____

[9]  Of the four voting Council members, only Lowrance was present for any of the meetings regarding the Lodge, due to his role as Fire Department liaison.  Batz acknowledges that Lowrance was in favor of the Lodge's closure.

[10]  "I had an argument with Batz at the Sebring Thunder event.  Batz was present at the event, even though he was scheduled to be on vacation, and told me that the Fire Department would not have been able to run the event without him

9.

Councilman Scott Stanley voted in favor of Batz's termination because he "thought the City deserved a better Fire Chief." DE 21-4 ¶ 7. Stanley is not shy in admitting that he did not like Batz. *Id*. ¶ 3. Batz was "too abrupt when dealing with people and he saw everthing in absolutes." DE 21-4 ¶ 3. "Batz constantly complained about the City's financial support, which I also did not like because he always wanted more money, despite the City continuing to meet his requests, including providing him with an administrative assistant." *Id*. ¶ 4.

Mayor Shoop testified as the City's Rule 30(b)(6) designee on several subjects, including the reasons for why he recommended Batz's discharge. (Shoop Depo. 7, 39). He testified that since he took office in April of 2014, "Batz was a very negative individual when it came to the public, when it came to the Council." (Shoop Depo. 39).

> On multiple occasions, business owners in Sebring called to complain about Chief Batz and his demeanor and attitude during fire inspections. I discussed these complaints with Batz and informed him I was unhappy with the way he managed the public, however, his behavior did not improve.

DE 21-5, Shoop Aff. ¶ 3.

> I attended a meeting with the organizers of the Heartland Triathlon and Chief Batz regarding how he was interacting with the organizers. Batz was very aggressive and combative in these meetings, resulting in

---

present. Batz and I then argued over his management style and Batz shouted at me and spoke in a very disrespectful tone." DE 21-2 ¶ 6.

> complaints from event organizers.  He sat in the meeting with his arms
> crossed and his head down, responding to questions with only short,
> abrupt statements.

*Id*. ¶ 4.

> Batz's treatment of the firefighters in his station was not any better.
> He ruled his department through fear, resulting in a high turnover rate
> at the fire station.  Members of his department feared retribution if
> they spoke against him or spoke with City Council on their concerns.
> Batz repeatedly denied vacation for the firefighters, with some working
> five 24-hour shifts in a row.

*Id*. ¶ 7.

> In addition to his confrontations with community members, Batz was
> also in an altercation with Lenard Carlisle at the public Sebring Thunder
> event.  Following this altercation, a meeting was called to discuss Batz's
> behavior.  At this meeting, Batz accused the City of not being supportive
> of him and not trusting him.  The incident with Lenard Carlisle was the
> final indication to me that the City should not continue to tolerate
> Batz's attitude and treatment towards others.

*Id*. ¶ 6.

The above cited affidavits present evidence that at least four people who dealt

with Batz found his demeanor, attitude, treatment of others and leadership at the

fire department unacceptable.  While each Council member had different

interactions with Batz to lead him to that conclusion, they unamiously agreed that

Batz should be terminated.

In *McDonnell Douglas Corp.*, 411 U.S. 792 (1973), the Supreme Court set forth

the basic allocation of burdens and order of presentation of proof for alleging

discriminatory, or in this case, unlawful retaliatory treatment.  First, the plaintiff has

the burden of proving by the preponderance of the evidence a prima facie case of retaliation.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id*. at 802.  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id*. at 804.

As the City has articulated legitimate, nondiscriminatory reasons for Batz's discharge, Batz now must

> demonstrate that the proffered reason[s were] not the true reasons for the employment decision.  This burden now merges with the ultimate burden of persuading the court that []he has been the victim of intentional retaliation. []He may succeed in this either directly by persuading the Court that a [retaliatory] reason more likely motivated the [Council members] or indirectly by showing that the [Council members] proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256 citing *McDonnell Douglas*, 411 U.S. at 804-805; *Gloetzner v. Lynch*, 225 F. Supp. 3d 1329, 1346 (N.D. Fla. 2016) citing *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Batz disputes that he acted improperly in his dealings with the public and the Council.  For evidence, Batz points to the period from 2012-2015 when he received outstanding performance evaluations.

From these facts the inference can be made that the negative behavior was not a problem, and that Defendant regarded Plaintiff as an outstanding employee overall, despite the isolated negative occurrences.  There were no written reports documenting any of the complaints . . .  The fact that Plaintiff's last performance evaluation, for 2015, was even more favorable than the previous ones permits the inference that Plaintiff's performance was not getting worse to the point that Defendant decided it could not tolerate it any longer. Something happened after October 1, 2015 to change the mayor's and the council's view of Plaintiff's performance, and the facts support the inference that it was the Kenilworth Lodge enforcement matter . . . and Plaintiff's speech in opposition to interference with his efforts to enforce the fire codes.

DE 31 at 15-16.

The City does not dispute the content of Batz's performance reviews, but

rather contends that they are immaterial.  It responds,

There is no dispute that the reviews were conducted by City Administrator Scott Noethlich, and there is equally no dispute that Noethlich had no decision-making role in the decision to discharge the Plaintiff.  The fact that someone not involved in the discharge decision held a different view than the decisionmakers as to Plaintiff's job performance cannot create a triable issue of fact.  Rather, the Plaintiff is obligated to meet the City's discharge decision head on and rebut it, not to recast it.  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons").

DE 34 at 7, n.3.

"A plaintiff is not allowed to recast an employer's reason or quarrel with its

wisdom, 'but must meet it head on and rebut it.'" *Loberger v. Del-Jen, Inc.*, 616

F.App'x 922, 927 (11th Cir. 2015) ("*Loberger*") quoting *Wilson v. B/E Aerospace, Inc.*,

376 F.3d 1079, 1088 (11th Cir. 2004).  "If the plaintiff does not proffer sufficient

evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Loberger*, 616 F.App'x at 927 quoting *Chapman*, 229 F.3d at 1024–25.

Batz asserts that even if the reasons the voting Council members gave for their decision to terminate him were true (that his demeanor, attitude, treatment of others and leadership at the Department were unacceptable), these issues "were problems of long standing which led to no written warnings and did not prevent Plaintiff from receiving highly favorable evaluations prior to the Kenilworth dispute. At a minimum, there are genuine issues of material fact as to whether Defendant has met its burden of proof on its claim that it would have discharged Plaintiff based on these issues, absent the protected speech."  DE 31 at 16.

Batz has misconstrued the nature of the burden that *McDonnell Douglas* and its progeny place on the City.  "[T]he employer's burden is satisfied if it simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'"  *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, n.2 (1978); *Burdine*, 450 U.S. at 253 ("9 J. Wigmore, Evidence § 2489 (3d ed. 1940) (the burden of persuasion 'never shifts')").  The burden of persuasion always remains on Batz to proffer either direct evidence sufficient to permit a reasonable fact finder to conclude that a retaliatory reason more likely motivated the Council members, or indirectly by showing that the Council members proffered explanation is unworthy of

credence.  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013).

It appears that Batz relies on Mayor Shoops' recommendation of termination as direct evidence that a retaliatory reason more likely motivated the Council members, and also asserts that the Council members' proffered explanation is unworthy of credence by making a "cat's paw" argument - that the Mayor had an impermissible motivation which tainted the decisions of the Council members.  Batz argues:

> Mayor Shoop's written recommendation of termination was distributed and read aloud to the City Council before it voted to discharge Chief Batz.  The reasons given for the recommendation were Plaintiff's handling of interactions within the fire department, with the general public and with the City Council and Administration.  Of the three reasons, Mayor Shoop wrote that it was "[m]ost importantly in his relations with the City Council and administration."  This was the only one that included Plaintiff's protected speech.
>
> * * * * *
>
> Councilman Carlisle states that he voted for termination based on Plaintiff's behavior and attitude and "his treatment of me at the Sebring Thunder event."  That was the event where Plaintiff complained to Carlisle that the City was undermining the enforcement of the fire codes with regard to the Kenilworth Lodge.  This is consistent with the testimony of Shoop . . . [when he stated] that Plaintiff's allegation that Council and the Administration did not have his back was the "most important" reason for his termination.  In its answers to Plaintiff's interrogatories, Defendant adopted Shoop's recommendation as its statement of the reasons for discharging Plaintiff.  As such, there are genuine issues of material fact as to whether Plaintiff's protected activity was a motivating factor in the decision to discharge Plaintiff.
>
> Alternatively, the facts may be analyzed under the cat's paw doctrine, in that Mayor Shoop used the rest of the City Council as his cat's paw to effectuate his wish to discharge Chief Batz because of his protected speech.  *Staub v. Proctor Hospital*, 562 U.S. 411 (2011).  Under the cat's paw doctrine, an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision.

DE 31 at 12-13 (citations omitted).

As far as Batz's argument that there are genuine issues of material fact as to whether Plaintiff's *protected speech* was a motivating factor in the decision to discharge him, this argument is rejected out of hand as it is concluded above that Batz's complaints about interference with his enforcement efforts were not statutorily protected.  Despite the existence of good or excellent performance reviews by Noethlich, Batz has not proffered any probative evidence to create a genuine issue of material fact regarding whether any of the Council members articulated reasons for deciding to fire him were pretextual.

This Court's role is not to second guess an employer's judgment.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.").  As a result, the Court fails to find pretext on the basis that despite excellent job reviews by the City Administrator, Council members found Batz's demeanor, attitude, treatment of others and leadership at the Department unacceptable.  *Keaton v. Cobb County*, 545 F. Supp. 2d 1275, 1293 (N.D. Ga. 2008) .

Under the cat's paw doctrine, a plaintiff may establish the requisite causation if he or she can show the decision maker "followed a biased recommendation without

independently investigating the complaint against the employee." *Godwin v. WellStar Health System, Inc.,* 615 F.App'x 518, 528 (11th Cir. 2015) quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)  "In such a case, the recommender is using the decision maker as a mere conduit, or cat's paw[,] to give effect to the recommender's discriminatory animus."  *Id.*  In cat's paw cases, the Eleventh Circuit assesses "whether the ultimate decision was merely a 'rubber stamp' of the recommendation when considering whether the decision-maker acted as a 'cat's paw.'"  *Id.*

In *Staub*,[11] the Supreme Court wrote: "[s]o long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA.  And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011).

The Court finds that the discharge decision in the instant case cannot be properly characterized as merely a rubber stamp of the Mayor Shoops' recommendation.  The Mayor and the voting Council members essentially agreed on the reasons why Batz should be terminated, and each Council member articulated

---

[11]  The *Staub* case was brought under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USSERA"), 38 U.S.C. § 4301 *et seq.*, which employs the same "motivating factor" standard as is applied to First Amendment cases such as the case at bar.  562 U.S. at 418-19.

their own experience interacting with Batz supporting their reasoning for voting to discharge him.  Batz has not demonstrated a factual dispute as to the motivations of any of the reasons held by the voting Council members.  Each of the Council members had their own interactions with Batz as the City's Fire Chief, and each formed their own opinions, as reflected in their undisputed affidavits.  Under these facts, Batz's cat's paw argument is rejected.

<u>Conclusion</u>

Viewing all evidence in the light most favorable to Batz, the Court finds Batz spoke not as a private citizen, but as the Fire Chief pursuant to his official duties, and his Complaint does not implicate the First Amendment (Count V).  *Fernandez v. School Board of Miami-Dade County, Fla.*, 898 F.3d 1324 (11th Cir. 2018).  Batz's statements about Noelhlith's communications with the owners of the Lodge do not constitute protected activity under the FWA, and Batz has not established a prima facie whistle-blower case on this basis.  Consequently, the City is entitled to summary judgment in its favor as to Batz's First Amendment claim and on any whistle-blower claim arising from Batz's complaint that Noelthich and other elected officials used their positions in an effort to secure an exemption from the Fire Safety Code for the Lodge.  *Burden v. City of Opa Locka*, 11-22018-CIV, 2012 WL 4764592, at *14 (S.D. Fla. Oct. 7, 2012).   Furthermore, the content of Batz's speech did not rise to the level of creating a reasonable inference that any public officer corruptly used or attempted to use his official position to secure a special privilege, benefit, or exemption for

himself, herself, or others.  The evidence is insufficient to create a genuine issue of

material fact regarding Noethlich's (or any other City officials') wrongful intent

coupled with a purpose of obtaining or receiving compensation for any benefit

resulting from securing an exemption from the Fire Safety Code for the Lodge (Counts

I and II).  Batz's email exchange with Noelthlich does not qualify as a written and

signed complaint under the FWA (Counts II and IV).  Assuming Batz's oral accusations

of misfeasance at a meeting or inquiry are sufficient to state a prima facie claim

(Count III), Batz is unable to show that Noethlich (and any other actors) retaliated

against him for complaining about interference with his enforcement efforts by firing

him.  He has not rebutted the Council members legitimate reasons for the adverse

employment action.  Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendant's Dispositive Motion for Summary

Judgment [DE 19] is granted in its entirety.  In accordance with Fed. R. Civ. P. 58,

final judgment will be entered by separate order.

DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County,

Florida, this 21st day of March, 2018.

KENNETH A. MARRA
United States District Judge